The next and final case on the call this morning is Metropolitan Life Insurance Company v. Brian Hamer, case number 114234. Good morning. May it please the Court. I'm Sunil Bawe and I'm here on behalf of the Illinois Department of Revenue. It's Director Brian Hamer and the State Treasurer Dan Rutherford. This case concerns the 2003 Tax Amnesty Act, which authorized the Department of Revenue to create an amnesty program for the purpose of collecting all taxes due within a 20-year period. The principal issue in this case is whether MetLife's unpaid tax liabilities for tax years 1998 and 1999 became due and owing on the date the tax returns for those years became due. If so, then MetLife was obligated to satisfy those unpaid liabilities within the 45-day amnesty window in the fall of 2003. Its failure to satisfy those unpaid liabilities, however, results in the imposition of double interest. So to determine when a tax liability becomes due, we look at the relevant tax statutes. And here we're dealing with income taxes, so we look at the Income Tax Act. Now, Section 601A of the Income Tax Act provides the starting and the ending point of the analysis because it's the only provision in Illinois tax law that defines when taxes become due. By its plain terms, Section 601A states that tax is due on the date the return is due, and specifically without notice and without assessment by the government. Thus, applying Section 601A to the facts at hand here compels a finding that MetLife's unpaid tax liabilities were due on the date the returns were due. For 1998, that would be March 1999, and for 1999, that would be March 2000. So what we have is unpaid tax liabilities for tax years covered by the Amnesty Act, and thus MetLife was obligated to satisfy those unpaid liabilities during the amnesty period. Its failure to do so warrants the imposition of double interest under Section 32F of the Uniform Penalty and Interest Act. The appellate court for the First District, on the other hand, ignored the plain terms of Section 601A of the Income Tax Act and created a new definition for when tax becomes due. The appellate court held that tax becomes due on the date the department issues a formal assessment as opposed to what the legislature mandated in Section 601A of the Income Tax Act. But the appellate court has provided no logical explanation for why it was redefining when tax becomes due as being the date of assessment. Indeed, MetLife contends that tax should be due on the date of assessment based on two inopposite cases from the 1980s, those being the Schmidt case and the Figge case, but a close examination of both of those cases reveals that neither case defined when tax becomes due. That was not an issue in either Schmidt or in Figge. In fact, the issue presented in both of those cases was one concerning election of remedies. How does the Federal Change Tax Liability Act figure into this? The Federal Change Tax Liability Act? Right. Are you referring to Section 506B? Section 506B of the Income Tax Act does not have any pertinent relevance to the facts at hand here because Section 506B does not deal with amnesty payments. And MetLife contends that it was unable to file an amended return during the amnesty period because Section 506B prohibited an amended return prior to a final change determination. However, nothing in Section 506B prohibits a taxpayer from participating in amnesty. The taxpayer's ability to participate in amnesty derives from Section L of the Department's Emergency Regulations. And Section L stated that a taxpayer may file an amended return to make an amnesty payment notwithstanding the fact that a final change liability has not been finally determined. So what the taxpayer would have done in this case, MetLife should have filed an amended return under Subsection L of the Department's Regulations and made the amnesty payment. And then when the IRS concluded its audit and the federal change liability was finally determined, MetLife could have then filed a Section 506B amended return. So we contend that the Section 506B Correct. At the time the amnesty payment is made, MetLife was obligated to make a good faith estimate of what its potential back taxes would be calculated. And then if the Department determined that the good faith payment was not really in good faith, then a penalty would still apply, right? The penalty would apply to the balance of any back tax that was not paid during the amnesty period. Indeed, MetLife has, from the date the return was due, MetLife has had a continuing obligation to pay all tax properly reportable. And this is also where the appellate court went wrong. The appellate court held that at the time the return was due, MetLife was obligated to only pay what it self-reported. But that's not a correct statement of tax law because the tax due is not what MetLife says is due. The tax due is what is properly reportable under the tax rates and the tax schedules and the tax tables. Doesn't it sound like it's impractical to require a taxpayer to pay an unknown tax liability at the risk of being subject to double interest? It doesn't seem like when someone is under an audit, neither the taxpayer nor the Department knows whether there is any liability at all. Well, it would not be unreasonable because what the Department required in the good faith estimate regulation was no different than what is required in the absence of amnesty. See, at the time a taxpayer makes their tax payment when the return is due, in effect the taxpayer is making a good faith estimate of what he or she believes the amount of tax is. And if you come up short, then the Department tags you with interest and penalties. That same estimation process that taxpayers engage in in the absence of amnesty when their original return is due is what was required again except during the amnesty period. So when the Amnesty Act went into effect, it effectively put all taxpayers in the state of Illinois on notice to go back a few years and sort of redo your homework, if you will, to reevaluate your tax returns and engage in that same probabilistic estimation process that you normally engage in when your tax returns are due and do that same thing and just make sure that you've paid all properly reportable taxes. Make sure you haven't claimed an exemption you were not entitled to. Make sure you haven't taken a deduction that you were not entitled to. So the process is actually identical to what taxpayers routinely do when they file their returns. It doesn't seem possible that the legislature contemplated that the double interest penalty might apply to a taxpayer such as MetLife, though. I don't see any legislative history on that. Actually, the legislative debates, one of the statements that we point out in our briefs by Senator Link, who is one of the co-sponsors of the Amnesty Act, he states that the purpose of the amnesty is to generate a substantial amount of revenue into the public fisc to thwart what the legislature deemed to be a financial crisis within the state of Illinois. And one of the hopes of the legislature was that even an undetermined number of taxpayers, and this is what Senator Link says, that the department has yet to even identify, would also come forward and pay their back taxes. Even though they know they're going to have a double penalty, double interest? Well, they would have a double penalty if they didn't pay their back taxes, but it's important to remember that amnesty also provided a substantial care. It wasn't just double interest. Taxpayers could also receive the abatement of 100 percent interest that they otherwise would pay. So in a case like this, in the absence of amnesty, MetLife would owe single interest on its back taxes. And again, there's no scienter requirement here. The failure to pay all properly reportable taxes results in single interest on the taxes accruing from the date the return was due. Well, amnesty didn't just tag you with double interest if you didn't participate. It encouraged you to participate by giving you 100 percent abatement of interest, so you wouldn't have to pay any interest on the back taxes. And here that would have been a substantial amount, given the fact that MetLife underpaid its taxes by about $1.5 million. You've discounted the relevancy of the 1984 cases, which said that the tax due is at the time of the Amnesty Act, but that appeared to be what the law was when the legislature enacted the new Amnesty Act. Does that have any relevance as to when taxes are due, or could they not have specifically indicated taxes being due when the original return was filed? Well, I think the comparison that MetLife makes between the 84 Act and the 2003 Act is really misplaced. Their reliance on the 1984 Act stems from both the Schmidt and the Figge case, but neither Schmidt nor Figge defined when tax becomes due. So just as the 2003 Act is silent as to when does tax become due, the 1984 Act equally is silent as to when tax becomes due. Indeed, the only provision that defines when income taxes becomes due is Section 601A of the Income Tax Act, and that's why we've always returned to Section 601A of the Income Tax Act. So looking at the 1984 Act really doesn't give us much evidence of what the legislature intended. Indeed, at the time the 2003 Act was passed, and when the 1984 Act was passed, the Section 601A of the Income Tax Act was in existence. So the legislature knew that it had previously defined income taxes as being due on the date the return is due under Section 601A of the Income Tax Act, yet in 1984 it did not choose to redefine when tax is due for purposes of amnesty, and it did not do the same in 2003. So it stands to reason that the legislature acted with knowledge of what Section 601A said at the time it passed the 1984 Act and the 2003 Act. So again, it stands to reason that the legislature would have intended to incorporate the definition of when tax is due into both the 1984 Act and the 2003 Act. And here sort of the concept of imparamateria comes into play because the terms used in the 84 Act and the 2003 Act are similar to what's used in Section 601A, taxes and due. And the legislature is presumed to give similar interpretation, intent for terms that are similar to have similar meanings, especially here where we're concerned with the same subject matter. To follow up on Justice Garmon's thought earlier, and I'm not sure I understand this, but MetLife was undergoing a federal audit, and when that ended, that changed the Illinois tax due. Is that correct? Right. Was there an ongoing Illinois audit at the same time? Does that make any difference? It doesn't make any difference, but there was an ongoing Illinois audit at the same time. The federal audit was initiated in 2000. Their Illinois, the change in their Illinois taxes could not have been ascertained Is that correct? Excuse me. It could have been ascertained. The way they would ascertain it is to engage in that probabilistic estimation judgment that they would have to do at the time the return was due. So really what's going on is, yes, there's a federal audit going on and there's a state audit going on, but that doesn't preclude MetLife from also looking at its own tax papers and tax returns and determining what the final change liability will be. And that's what the department was requiring. The department was requiring all taxpayers pay your back taxes. If you owe any back taxes, pay them. If you're not sure whether you have back taxes, use your probabilistic estimation skills. You do it anyways when you file your original return. Do the same thing. Go back. Check your homework. Make sure you've paid all properly reportable taxes, because from the date the return is due, every taxpayer has an obligation to the public FISC is to pay all properly reportable taxes, not just the amount of tax that you think you owe. So according to the department's position, it makes no difference that there was a federal audit or a state audit. It applies across the board, and if you paid your taxes and no question has been raised, and then later on it's determined that there's more tax, you would be in violation of the Tax Amnesty Act. That's correct, and I think, Your Honor, what you're raising is sort of the facts in the Marriott case. In the Marriott case, the audit was initiated after the close of the amnesty period, but that fact, we believe, is not relevant because taxpayers are on notice to check their prior year's tax returns by the Amnesty Act itself. When the Amnesty Act went into effect, then taxpayers are on notice to go back and check your tax returns, because if you don't do that, then you're running the risk of double interest. So every taxpayer, even Marriott, even though the audit wasn't initiated until 2004, it was on notice in 2003 when the Amnesty Act went into effect, that there's a possibility we could be tagged with double interest if we are not careful and double check our prior year's tax returns. So what the department is requiring all taxpayers to do is to make a good faith estimate of what you believe you may owe in back taxes, even if you're not under an audit, because the department does not have unlimited resources to audit every taxpayer in the state of Illinois. The department can't issue an assessment against every taxpayer in the state of Illinois. It simply just can't do that. Only a small percentage of taxpayers are actually audited and issued assessments, but the purpose of amnesty is to generate substantial revenue by collecting taxes that are properly owed to the public fisc. If MetLife had made a good faith estimate and had the department accepted it and it came up short, you would assess the double interest only on the shortage. This could result in a substantial shortfall to the state of Illinois, could it not? They did, in fact, pay the 100% interest, not the 200%. They paid the 100% interest, right, but not the 200%. They would avoid paying the interest of 100% on the amount that they estimated. The state would pick up the 200% on the underestimated. It could be a shortfall under the facts of any case, I suppose. It could be, depending on what the numbers are. But, again, the purpose of amnesty is not simply just to generate revenue for the state. It's to generate revenue at a particular point in time. I mean, that's right, and one of the things MetLife says is, well, if we participated in an amnesty, you would have never gotten the single interest because we would have abated 100% of interest. That is true, but the purpose of amnesty is there's a financial crisis in the state right now, and it's sort of this big factor that requires a substantial amount of revenue to counter that financial crisis right now. So whether the public FISC would have received the money in the future or not, the question is really would the financial condition have been alleviated at that point. Indeed, if the appellate court's decision holding that tax becomes due on the date of assessment is affirmed, then there is one practical consequence, which would be to undermine the legislative intent. Justice Carmine, this goes to what you're saying as far as shortchanging the public FISC. Again, only a small percentage of taxpayers are actually audited and assessed. So if we hold that the only taxes due for purposes of amnesty are those that have been finally assessed, then we significantly narrow the universe of potentially eligible tax liabilities and ensure that the legislature would not have intended for such a small percentage of tax liabilities to be subject to the Amnesty Act. As one final point on this issue, I'd like to discuss the 2010 amendment to the Uniform Penalty and Interest Act. If Metlife's position is correct that unassessed liabilities are not subject to double interest in 2003, then the 2010 amendments become very hard to explain because the 2010 amendments exempt from double interest the exact same types of tax liabilities that Metlife contends were already exempt. And there's a clear presumption that the legislature does not enact meaningless or superfluous provisions, and the presumption is that this was a change in the law and not a mere clarification. And that's Metlife's heavy burden to rebut that presumption. And as we've explained in our briefs, Metlife has failed on that point. So again, this does raise the practical issue of how a taxpayer in Metlife's position who owes back taxes but is not precisely aware of the precise amount of back taxes that will ultimately be determined can participate in amnesty. And that's exactly why the department promulgated the Good Faith Estimate Regulation. The department recognized that there was this potential problem, but by requiring that taxpayers sort of engage in this probabilistic estimation judgment as to what their back taxes may be, it required nothing more than what was required at the time the original return was due. And as an explanation on this point, the unrebutted evidence is actually that dozens of taxpayers who were in Metlife's position who did not know the precise amount of their tax liabilities were able to make this estimation and were able to pay a good faith estimate during the amnesty period. So it seems a little hard to believe that Metlife, being as big of a company as it is, is the type of corporation that would be unsophisticated and not be able to engage in its reasonable probabilistic estimation of what its back taxes are. Because Metlife's unpaid tax liabilities became due on the date the return is due and not on the date of assessment, it was obligated to satisfy its liabilities during the amnesty period and therefore double interest was warranted. Thank you. Good morning, and may it please the Court. I'm John Beek of Neal Gerber and Eisenberg, appearing on behalf of Metropolitan Life Insurance Company, the Applee in this case. This case presents the question of whether Metlife should be punished with the double interest penalty of the 2003 Amnesty Act for not having been able to predict the additional amount of Illinois tax liability that the company would ultimately owe as a result of an IRS audit that was still in its early stages during the October to mid-November 2003 amnesty reporting period. We call that Metlife's federal change tax liability. The circuit court and the appellate court have both held in this case that the phrase all taxes due in the 2003 Amnesty Act means taxes that a taxpayer knew were due and owing during the amnesty reporting period, and both of the courts ruled in favor of Metlife on that basis. The appellate court made it clear in its opinion that it was interpreting the phrase all taxes due in the 2003 Amnesty Act and that the appellate court was not deciding when Metlife's federal change tax liability, once it ultimately had been determined after that IRS wound its way to a conclusion and was finalized, when that federal change tax liability was owed to the state of Illinois under section 601A. Therefore, all of the department's claims in its briefs and at argument this morning that the appellate court's opinion will turn the Illinois tax collection system on its head and that it's going to lead to widespread noncompliance with Illinois taxes are baseless. The fact is that taxes under 601A would still be owed as of the original due date of the return. We don't dispute that, and that's what Metlife reported and paid interest on. The department would still have the ability to conduct audits of taxpayers, and if the department auditor determines a deficiency, that deficiency would, of course, be owed to the state, have to be paid, and interest would be due on it. So the appellate court focused solely on the phrase all taxes due in the 2003 Amnesty Act, and it in no way addressed or disturbed section 601A of the Illinois Income Tax Act and general tax compliance. Under 601A, then, the words honor before the date fixed for filing such return, do they have any significance at all, then, in this context? Not in this context, Justice Thomas, because 601A is a longstanding rule under the Illinois Income Tax Act, and it governs when taxes are to be reported on the original return under the voluntary reporting system that Illinois has and the federal government has for that matter. What we have before us this morning is the 2003 Amnesty Act, which was a separate regime that was requiring taxpayers during that October to mid-November 2003 reporting period to report in taxes that were due, we say known taxes, and if that taxpayer didn't report in all the taxes that were due that they knew about, then there would be this punitive double interest charge and maybe double penalties. And so it's a separate regime, a really big penalty over and above, you know, the regular interest and the regular penalties and all that apply. Isn't 601A the only place where when taxes are due is defined? They're not defined in the Amnesty Act, right? That's why we're here. Well, we're here because you're right, Your Honor, it's not defined in the Amnesty Act per se, but we have substantial amounts of language in the 2003 Amnesty Act itself that informs this, you know, question, as well as an ample amount of legislative intent and judicial interpretation of that same phrase, all taxes due in the 1984 Act. And I think that all ties together because when the General Assembly was drafting and enacting the 2003 Amnesty Act, they had the precedent of the 1984 Amnesty Act before them in the language, they had before them that in 1984 Schmidt and Figge had interpreted all taxes due to mean known tax liabilities. They had before them that when the department implemented the 1984 Amnesty Act, it applied it very clearly to known tax liabilities and the regulation that the department issued in 1984 under that Amnesty Act didn't have anything, you know, like this good faith payment requirement for federal changes that weren't yet final during the 1984 Amnesty reporting period or otherwise. So the department itself applied the 1984 Act to known tax liabilities and that's why I think it's a little difficult for the department to argue that Schmidt and Figge, you know, are inapposite and really are irrelevant to the matter at hand because it's all a matter of ultimately what the General Assembly was contemplating in mid-2003, when they drafted and enacted the 2003 Amnesty Act. I hope I've answered your question, Your Honor. So the facts in this case are straightforward and not in dispute. MetLife timely filed its federal and Illinois returns for 1998 and 1999 and paid the taxes reported on those returns. The department agrees that MetLife was undergoing a routine federal income tax audit of the 1998 and 1999 years during the Amnesty reporting period in the fall of 2003. Consistent with long-established Illinois income tax procedure, MetLife reported the federal change tax liability for 1998 and 1999 to the department once that liability had been determined through this lengthy federal audit and finalized between MetLife and the IRS. And that finalization and determination of that federal change tax liability occurred in July of 2004, more than eight months after the Amnesty reporting period had concluded. And MetLife did all of that totally consistently with Section 506B of the Income Tax Act, which is what governs federal changes. Under the Income Tax Act and the department's long-standing administrative policies, taxpayers were neither required nor permitted to estimate how much the IRS might adjust a taxpayer's federal taxable income up or down in the IRS audit and then for the taxpayer to report or file an amended return that, you know, reported that estimate and paid in or claimed back with respect to that. The department didn't permit that or allow it and the Income Tax Act didn't either. MetLife made a timely payment of its federal change tax liability to Illinois once it had been ultimately determined in July of 2004. And as we've said, MetLife paid the regular interest, which was in fact due. It conceded it. And what that regular interest really represented was the additional Illinois tax payments that MetLife with 20-20 hindsight should have included on its original Illinois returns from 1998 and 1999. Now, the appellate court has correctly held in this case that the phrase all taxes due means, again, for purposes of the 2003 Amnesty Act, taxes that a taxpayer knew were due and owing during the The appellate court found that under the circumstances of this particular case, MetLife could not have participated in the 2003 Amnesty Act program and should have been required to because it didn't have the information that it would have needed to be able to estimate and determine what its federal change tax liability was ultimately going to be. The appellate court determined that the regulation, good faith estimate payment requirement, particularly in the context of a federal change that wasn't yet even reportable under Section 506B, because it wasn't determined and finalized, was not authorized by the 2003 Amnesty Act statute. And finally, and this is I think really kind of pertinent, that the provision or statement in the department's 2003 Amnesty Act regulation that the phrase all taxes due encompassed whatever in Illinois tax liability ultimately turned out to be post-amnesty reporting period, even if the taxpayer in the department didn't even know that there would be an additional tax liability to Illinois, that that all was illogical and the regulation was invalid. And as a matter of statutory constructive and construction and legislative intent, I would submit that the appellate court was totally correct on this for at least the following four reasons. First, we have the language of the 2003 Amnesty Act itself. As Justice Thomas pointed out, the 2003 Amnesty Act may not have defined the phrase all taxes due, but it did include the statement or the provision that failure to pay all taxes due to the state for a taxable period covered by the act shall invalidate any amnesty granted under this act. Now, if the department is correct that the phrase all taxes due really means whatever tax liability pops up post-amnesty reporting period and is determined to be due, and that that's, you know, that unknown tax liability is part of the all taxes due under the 2003 Amnesty Act, even if the taxpayer didn't know about it and the department didn't know about it, then such a taxpayer under that circumstance through no fault of its own would retroactively lose the benefit of the abatement of interest and penalties on the amnesty payment that the taxpayer was supposed to receive under the 2003 Amnesty Act. In addition, of course, to owing double interest and maybe double penalties on any, maybe any shortfall in the amnesty payment, I would submit that the General Assembly didn't mean the 2003 Amnesty Act to be so fickle in its application as to snatch abatement benefits back from taxpayers who had unknown tax liabilities. Help me out, counsel, with the whole rationale here. The difference here between, you know, John Q. Public who files a tax return on a certain date, April 15th, and is not aware that he or she has other tax liability. You know, no fault of their own, really in that case made a good faith estimate, and then later an audit's done of that taxpayer and they find out and they say, you know, sorry, you forgot about this gain over here, and now you're going to, it's two years later, you're going to hit with interest and penalties. Why would the rationale be so different under the amnesty program? You mean ask whether that, why that taxpayer owes interest on the original? It's down to, again, another way of asking the question, why in the other circumstances are taxes due and owing defined as when you file a return, and under the Amnesty Act, they wouldn't have that requirement. Well, I guess at the risk of repeating myself, Your Honor, which is never a good idea, Section 601 and that whole regular regime requires taxpayers to self-report their tax liabilities, and if it turns out that there was... You did say that. I want to know the why. Give me the rationale for why under the Amnesty Act something different would be required than under... Well, because I think in 2003, just as they had in 1984, the General Assembly was adopting this separate program that was requiring taxpayers to, if they had a known tax liability, they better pay it in during the amnesty reporting period, or else they would suffer double interest and maybe double penalty. And that's where counsel said, it's, we need the money and we need the money now. That's the reason that they're offering amnesty. Well, and the State certainly needed money, there's no doubt about that, but first of all, they had to do it within the bounds of the law, and for that matter, what the due process clause would require. It can't be too arbitrary. I also think that in enacting an amnesty program that applied to liabilities that taxpayers knew about, and that's what the 1903 Act was about. And what the 1984 precedent had done, there were still going to be plenty of taxpayers out there that, you know, knew they had a tax liability. Because, you know, they knew they had, for example, nexus in the state and they, you know, hadn't been paying income tax or collecting sales tax. They maybe were sufficiently far along, for that matter, in an IRS audit that they knew they were going to have additional federal taxable income that would then flow through to the Illinois return. And so that was something that, you know, they could pay in, because that had been determined through the IRS audit process. So I think there was plenty of money for the State to capture through the 2003 Amnesty Act as it applied to liabilities that a taxpayer knew about. But what the General Assembly didn't mean when they were enacting this separate amnesty program with its supercharged penalty provisions was to ding taxpayers who didn't know that they had a tax liability and say, you know what, you have a tax liability we now all discover. Because that tax liability relates to a tax period covered by the Amnesty Act, we're going to sock you not only with the regular interest, but also with this doubled interest amount. That really is quite a lot harsher than what the regular income tax enforcement and compliance provisions require. Counsel, you made a description of this, you know, John Q. public person who might have understood that there was something out there that they should have either took a deduction they shouldn't have or something like that, and that's what the purpose of the Amnesty Act was. Can you give us really briefly some idea of what this audit was about that MetLife was being audited about? What were the issues? Do we know? Is it in our record at all? You know, it's not in the record, and to be honest, I'm not intimately familiar with all of the issues, because it was an audit that had gone on for several years. I've seen them. The MetLife federal tax returns are, I think, like a foot thick. They're very complicated returns with many, many issues and items reported in them. And, you know, like many other large corporate taxpayers, issues come up for discussion between the IRS agent and the taxpayer. And there are gray issues, you know, for example, whether something's deductible or not, whether it has to be reported for this period versus another tax period. And I'm pretty confident that those were the types of issues that were involved in that IRS audit as it played out. And I guess I go back to Justice Thomas' question. That may be more complicated, but why isn't that MetLife's predicament the same as any other taxpayer in the state of Illinois who may have been involved in a tax audit? Who may have been unsure that after they paid their taxes on a certain date, April 15th or whatever, that maybe there was something else that they, in fact, owe. How is it any different? You know, I don't know that it really is any different, and maybe I'm failing to appreciate it. You know, if a taxpayer who had a tax liability that they knew about, then they were required to pay it during the 2003 amnesty period. I don't think there's a distinction between a small taxpayer and a big taxpayer, but I think that the tax liability was different, and I don't think there was a distinction. You know, the 1984 precedent, the legislative history in 2003, and Schmidt and Figge tell us that what the Amnesty Act was supposed to apply to were, you know, known tax liabilities as opposed to unknown tax liabilities that only were discovered post-amnesty reporting period. It wasn't meant to just sweep everything in. You know, if the General Assembly had wanted to do that, it would have been more straightforward for them just simply to double the rate of the interest in the regular interest statute, and if a deficiency was discovered post-amnesty reporting period, here's your double interest. They wouldn't have had to go through the gyrations of the 2003 Amnesty Act and all taxes due and all of that. But wouldn't the, if the purpose of the act was to provide a strong incentive for taxpayers to pay up on any taxes that they owed or believe they, I mean, there's some question you might owe, or within that period in order to free up cash right away, doesn't your interpretation destroy that incentive? In other words, as long as you can wait them out until after the window and say, well, I didn't know it, sure, you have to pay the taxes and interest, but you have a financial incentive to ignore it, to ignore the tax amnesty provisions, don't you? Well, I think if you knew that you had a tax liability, be it a large taxpayer or a small taxpayer, you were supposed to pay it in, and there were double interest consequences for not doing so. But if your return is under an audit, you certainly have a heightened idea that there could, might or could well be more tax liability due. I think it's probably fair to say that MetLife, you know, might have ended owing something, but what was it going to be? It had no idea in the October to mid-November 2003 amnesty reporting period, and it would have been just picking a number out of the air and saying, okay, there's our estimate, you know, we'll pay it in. And then, you know, as we point out in the brief, because the department took the position and is taking the position that there's a one-year limitations period, there could have been real problems with MetLife, if it had even been able to make a good faith estimate of what its federal change liability was going to be, with it being able to actually recover a refund, because the one-year limitations period would have cut that off. But as far as MetLife is concerned, since it was known eight months afterwards, you probably could have met the year. Isn't that right? The one-year limitation? Well, as it turned out, as it turned out, this IRS audit did actually wrap up in July of 2004, but MetLife's audits, like a lot of big company audits, go on for years, because the IRS agents are juggling multiple audits, and so as MetLife stood there during the 2003 amnesty reporting period, it didn't know, well, first of all, it didn't have the information to make the estimate, but even if it did, it wouldn't have known that the IRS audit was going to conveniently conclude before the one-year period ended. If there was no underpayment found in the audits, would MetLife have benefited from the amnesty period, since those tax returns were during the amnesty period? If I understand the question correctly, if MetLife had been able to precisely estimate what its additional liability was going to be and pay it in, yes, it would have been ahead, because I believe, as one of you pointed out, maybe it was you, Your Honor, there would have been a baseline of what the amnesty was going to be. It would have been a statement of the interest on the amnesty payment itself, and so MetLife would have been ahead, but, again, it didn't know or have the information to prepare an estimate of what its tax liability was going to be, and so it would have just been picking a number out of the air and paying it in, and I don't think it could have. But it wouldn't have said, under those circumstances, the amnesty program doesn't apply to me, right? They would have taken advantage of the state. I guess if they had, if the facts were different and MetLife had had enough information to know, you know, what its tax liability was going to be, yes, it probably would have had a motivation to come forward and say, here's the number, and, you know, we'll get the abatement of the interest and penalties. In light of that, there was still no obligation to make a good faith estimate, or is it your contention that there was a good faith estimate made here? My contention is that MetLife did not, you know, that the act applied to known tax liabilities, and MetLife did not have the information to make a good faith estimate of what its federal change tax liability was going to be. It would have been guessing at a number, and so it wasn't required. Under the language of the 2003 Amnesty Act itself, Schmidt and Figge and the precedent of the 84 Act, and for that matter, you know, the gloss that the 2010 Amnesty Act puts on this, because remember, in 2010, the General Assembly, am I going too far? Yes. I'm aware of that. I'm just trying to answer a question. Thank you. So I'm done? Yes. Okay. Thank you. May it please the Court. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. With respect to the argument that the Amnesty Act states that failure to pay all taxes due within the amnesty period will result in the invalidation of all amnesty for any amount that may be paid by MetLife as part of a good faith estimate, that's just an incorrect statement of law. The invalidation provision applies to only if the taxpayer does not pay all taxes due after making a good faith estimate payment, and that is not the case. The invalidation provision applies in this context. You owe back taxes, and then you make a good faith estimate of what you owe during the amnesty period. But suppose you come up short. Well, you get abatement of interest for everything that you paid, and you get double interest for the amount you came up short. Now you'll be assessed the double interest and the shortfall. If you fail to pay that assessment, the double interest and the shortfall, only then will you lose all the benefits of amnesty. So if you make the payment and you receive the 100 percent abatement of interest but you still come up short on the total amount of the back taxes, you still have an opportunity to pay the shortfall and the double interest without losing the amnesty that you received for the amount that you came up short. With respect to the refund argument that MetLife makes, I think the score just pointed out that in this case, MetLife's audit terminated eight months after the close of the amnesty period. So with respect to its substantive due process claim that it would never have been able to receive a refund in the event that it had made a good faith estimate and overpaid, that really is baseless. Because it would have had more than enough time to file a refund claim. And as the appellate court has recently held in another case, the refund limitations period is interpreted as being two years, not simply one year. So the department, based on this appellate court precedent, would apply the two-year limitations provision. So again, because all taxes due is not defined in the Amnesty Act, but it is defined in Section 601A of the Income Tax Act, it makes sense to believe that the legislature would have intended for Section 601A to be the controlling definition of when taxes become due. And again, the estimation process is the same in the absence of amnesty as it is in amnesty. If there are no other questions, then we do respectfully request that both the judgments of the appellate and the circuit courts be reversed and judgment be entered in favor of the defendants. Thank you. Marshal, case number 114234 will be taken under advisement as agenda number eight. The Supreme Court stands adjourned until Tuesday, March 19th at 9 a.m.